UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
ERIC BROWN,                             )
                                        )
            Petitioner,                 )
                                        )
            v.                          )        Civil Action No. 08-11953-NMG
                                        )
STEPHEN J. O'BRIEN,                     )
                                        )
            Respondent.                 )
_____)

REPORT AND RECOMMENDATION ON
PETITION FOR WRIT OF HABEAS CORPUS

August 18, 2010

BOAL, M.J.

On November 24, 2008, Eric Brown ("Brown"), who is currently serving two

consecutive life sentences in a Massachusetts correctional facility, petitioned this Court for a

writ of habeas corpus pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and

Effective Death Penalty Act of 1996 (AEDPA). [Docket #1].  The Respondent, Steven J.

O'Brien, opposes the Petition. [Docket #6, 10, 14].

This case arose from the shooting deaths of Athos Oliveira and Thomas Meyer in Boston

on June 16, 1996.  Ten days after the murders, police in Lincoln, Massachusetts stopped a car

driven by petitioner Brown.  Inside the car, they found the shotgun used in the murders.  After

his arrest, Brown underwent extensive psychiatric evaluation and spent several years at

Bridgewater State Hospital before being found competent to stand trial in March 2001.  A jury

found him guilty on two charges of murder in the first degree, unlawful possession of a shotgun,

and unlawful possession of ammunition.  On direct appeal, the Supreme Judicial Court of Massachusetts affirmed the convictions.

In his petition, Brown argues that his right to due process of law, guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, has been violated.  First, Brown argues that the evidence presented in the Commonwealth's case-in-chief was insufficient to prove that Brown committed murder beyond a reasonable doubt.  (Petitioner's Memorandum of Law in Support of Petition for Writ of Habeas Corpus ("Pet. Br.") at 26-42).  Second, Brown argues that the Commonwealth's introduction of evidence regarding his post-arrest silence deprived him of a fair trial.  (Pet. Br. at 43-55).  Third, he argues that the trial judge's failure to instruct the jury regarding his alleged voluntary intoxication unconstitutionally lowered the Commonwealth's burden of proof.  (Pet. Br. at 56-62).  Fourth, he claims that the trial judge's ruling that Brown was competent to stand trial also deprived him of a fair trial.  (Pet. Br. at 63-69).  Finally, Brown argues that the trial judge should have held a *voir dire* as to the voluntariness of Brown's statements that were made between June 15 and June 26, 1996.  (Pet. Br. at 69-79).  For the reasons set forth below, I recommend that the District Judge DENY the Petition.

I.      PROCEDURAL BACKGROUND

On August 5, 1996, a Suffolk County grand jury indicted Brown on two charges of murder in the first degree, unlawful possession of a shotgun, and unlawful possession of ammunition.  (S.A. 5, 25).[1]  After his arrest, Brown was committed to Bridgewater State Hospital ("Bridgewater") for observation pursuant to G.L. c. 123, § 18(a).  (S.A. 6).  On

---

[1] "S.A. ___" refers to cites to the Supplemental Answer filed by Respondent.

November 6, 1996, Brown's commitment was extended for an additional six months pursuant to G.L. c. 123, § 18(a).  (S.A. 6).  On February 11, 1997, after a hearing, the Superior Court found Brown competent to stand trial.  (S.A. 7).  On February 10, 1998, the Superior Court ordered an examination of Brown pursuant to G.L. c. 123, § 15(a) to determine Brown's competency to stand trial, and Brown was committed to Bridgewater for further observation pursuant to G.L. c. 123, § 15(b).  (S.A. 8-9).

Following a hearing on April 9, 1998, Brown was found not competent to stand trial and committed to Bridgewater under G.L. c. 123, § 16(b).  (S.A. 9).  Various judges of the Superior Court renewed Brown's commitment.  (S.A. 10, 12-14).  On January 25, 2001, the Superior Court held a hearing at which it concluded that Brown was competent to stand trial.  (S.A. 15).  The Superior Court also ordered that Brown be reexamined on March 7, 2001, the day that trial was scheduled to begin.  (S.A. 15).

On March 7, 2001, defense counsel submitted a report to the Superior Court regarding Brown's competency to stand trial.  (S.A. 16).  The court then ordered that Brown be further evaluated by the court clinical psychologist, who opined that Brown was incompetent to stand trial.  (S.A. 16).  The judge continued the trial and ordered that Brown be evaluated by the Commonwealth's psychologist.  (S.A. 16).  The Commonwealth filed its psychologist's report on March 9, and the court held a competency hearing over four days during the period of March 12 through March 21.  (S.A. 16, 18).  At the competency hearing, a psychiatrist retained by the Commonwealth opined that Brown had sufficient ability to consult with his attorney with a reasonable degree of rational understanding, that he had a rational, as well as a factual understanding, of the court proceedings and that therefore he was competent to stand trial.  (S.A.

3

211-218).  The defense called three witnesses, including a psychiatrist who testified that Brown was not competent to stand trial.  (S.A. 214).

On March 23, 2001, the Superior Court issued a written opinion finding Brown competent to stand trial.  (S.A. 18, 211-219).  On that same day, the trial began.  (S.A. 18).  After a four-week jury trial, Brown was found guilty on all counts.  (S.A. 22, 229-236).  Brown was sentenced to consecutive terms of life on the murder convictions and to a concurrent two and one-half to five years for unlawful possession of a dangerous weapon.  (S.A. 22).  The ammunition conviction was placed on file with Brown's consent.  (S.A. 22).

On May 1, 2001, Brown filed a timely notice of appeal.  (S.A. 22, 237).  On direct appeal pursuant to G.L. c. 278, § 33E, the Supreme Judicial Court of Massachusetts ("SJC") affirmed Brown's convictions on August 29, 2007.  Commonwealth v. Brown, 449 Mass. 747 (2007). This habeas petition followed on November 24, 2008.

II.      FACTUAL BACKGROUND

The following recitation of the facts by the SJC is presumed to be correct.  See 28 U.S.C. § 2254(e)(1); Gunter v. Maloney, 291 F.3d 74, 76 (1st Cir. 2002).

> On the morning of Saturday, June 15, 1996, Brown asked his friend
> Dwight Bobbitt, a security guard who possessed a firearms identification card, to
> purchase a shotgun for him.[2]  Brown told Bobbitt that he needed the gun "for
> business."  Brown gave Bobbitt $280 cash,[3] and the two men boarded a bus to
> travel from the Roxbury neighborhood of Boston to the Bob Smith's Sporting

---

[2]  Footnote 11 of the SJC's decision, inserted at this point, states: "Bobbitt testified that on Saturday, June 15, 1996, he had no trouble understanding what Brown had said to him; nor did Brown seem to have any trouble understanding him."

[3]  Footnote 12 of the SJC's decision, inserted at this point, states: "Earlier on Saturday, June 15, 1996, Brown had cashed a paycheck dated June 13, 1996, for $297.17 at All Checks Cashed in Roxbury."

Goods store in downtown Boston.  Brown told Bobbitt that he would look at the guns, then point at the one he wanted and say "that's the freshest, that's the one I want."

When the two arrived at the store, they went to the gun department.  As Bobbitt looked at a particular shotgun, Brown told him, "that's the freshest." Brown walked away, and Bobbitt approached the salesman and purchased the gun, a "Mossberg 500" twenty-gauge shotgun with an eighteen inch barrel,[4] along with one box of ammunition,[5] at a total cost of $268.21.  Brown and Bobbitt then took a taxicab back to Roxbury.  When they parted so that Bobbitt could go to work, Brown took the shotgun and ammunition with him.  Bobbitt told Brown to remove the serial number from the gun with a file because he would report the gun stolen in two weeks.[6]

When Bobbitt returned home from work after midnight, he found Brown in the company of two friends outside Brown's residence in Roxbury.  Brown brought the shotgun outside, fired it into the air three or four times, and picked up the spent shell casings.  Brown then went inside, came back outside, [pointed] the gun into the air again, and then went back inside.  Responding to a call reporting shots fired, two Boston police officers arrived at Brown's residence at about 2 A.M.  When questioned by police, Bobbitt and the others denied having heard any shots.  The officers then left.  Fifteen minutes later, Brown came outside again. He was wearing a thigh-length green jacket and black boots.  Brown pulled the shotgun out from under his jacket and again fired it into the air three times.  He then left on foot, heading in the direction of the South End.

It was warm, and despite the early hour, people on Appleton Street were outside socializing and walking about.  Among them was Athos Oliveira, who had driven to the South End from his home in Somerville.  At approximately 3:30 A.M., a man approached Oliveira in front of 106 Appleton Street, pointed a shotgun at him, and fired twice.  The first shot grazed Oliveira's head, taking off

---

[4]  Footnote 13 of the SJC's decision, inserted at this point, states: "The shotgun operated by a 'pump action.'  A tube below the barrel would hold several shells.  The shooter would introduce a shell into the chamber by pulling a grip along the barrel and then fire by pulling the trigger.  When the grip was pulled again, the used casing would be ejected to make room for the next shell."

[5]  Footnote 14 of the SJC's decision, inserted at this point, states: "The box of ammunition contained twenty-five twenty-gauge shotgun shells."

[6]  Footnote 15 of the SJC's decision, inserted at this point, states: "Bobbitt did subsequently report the gun stolen, telling the police that his brother had taken it.  At trial, he admitted that this was false."

his cap and shredding its bill.  The second shot was a direct hit to Oliveira's face and neck.  He was killed almost instantly.

The man then ran down Appleton Street toward the intersection with Dartmouth Street.  A group of men getting out of an automobile parked along Dartmouth Street saw the shooter approach them, hesitate, then continue down Appleton Street.  The assailant soon encountered Thomas Meyer, who was standing across from 131 Appleton Street.  Meyer was dressed in a black tuxedo because he had attended a friend's wedding reception in the Back Bay section of Boston earlier that evening.  The assailant fired a single shot into the back of Meyer's head, killing him instantly.[7]  He then continued down Appleton Street, heading toward West Canton Street.

Witnesses who observed the man who shot Oliveira and Meyer described him as a black male with Afro-style hair wearing a thigh-length green jacket. This general description matched that of Brown.  Police investigators responding to the scene also found several spent shotgun shell casings near where the bodies of Oliveira and Meyer lay.[8]  A ballistics expert later determined that all of the shells have been fired from the same shotgun.

It is unclear where the assailant went after he shot Meyer and continued down Appleton Street.  The next witness to report seeing Eric Brown was Bobbitt.  They met in front of Brown's residence sometime on the morning of Sunday, June 16, 1996.  Bobbitt asked him if he had heard about the killings in the South End that had occurred earlier that morning.  Brown said, "No.  Why you asking me.  Do I look like that type?"  Bobbitt testified that during this exchange Brown did not appear to have any problem understanding what he was saying; nor did Bobbitt have trouble understanding Brown.

Ten days later, at approximately 3:25 A.M. on June 26, 1996, a police officer in Lincoln observed a van driving erratically along an otherwise quiet two-lane road.  The officer stopped and approached the van.  Brown was in the driver's seat, alone in the vehicle.  Music was blaring from the radio.  Without prompting, Brown presented the officer with an expired Rhode Island driver's

---

[7]  Footnote 16 of the SJC's decision, inserted at this point, states: "A ballistics expert later determined that the shots at both Athos Oliveira and Thomas Meyer were fired from six to eight feet."

[8]  Footnote 17 of the SJC's decision, inserted at this point, states: "One shotgun shell casing was recovered in front of 106 Appleton Street; a second was found in front of 120 Appleton Street; and a third in front of 151 Appleton Street."

license.[9]  Brown would not, however, make eye contact with the officer, nor did he respond to a request that he turn down the radio's volume.  When asked where he was coming from, Brown told the officer that he had taken two girls from a party in Cambridge to Winchester, and was now returning home.

The officer became concerned for his safety and called for backup.  When another officer arrived, Brown was asked to step out of the vehicle.  The officers asked Brown if they could search the van for drugs and weapons, and he assented.  Inside they found a loaded shotgun and a spent shotgun shell.[10]  Brown was placed under arrest for unlawful possession of a firearm and given Miranda warnings.[11]

Using the serial number on the shotgun, the officers determined that it had been purchased at Bob Smith's Sporting Goods and reported stolen to the Boston police by Bobbitt.  The shotgun was later test fired for ballistic analysis.  The marks on the casings matched those on the casings found on Appleton Street.  In a subsequent search of the apartment where Brown lived, the police found an empty box of twenty-gauge shotgun shells on the floor of his bedroom bearing a price tag from Bob Smith's Sporting Goods.  They also found a thigh-length green coat.

Commonwealth v. Brown, 449 Mass. at 751-754.

III.   DISCUSSION

A.   Habeas Corpus Standard Of Review

Brown cannot obtain federal habeas relief under 28 U.S.C. § 2254(d) unless he can show

that the SJC's decision "was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §

---

[9]  Footnote 18 of the SJC's decision, inserted at this point, states: "The license had expired on Brown's birthday two years before.  The officer later learned from his dispatcher that Brown had a valid Massachusetts driver's license."

[10]  Footnote 19 of the SJC's decision, inserted at this point, states: "At trial, Bobbitt identified the weapon found in Brown's car as the one he had purchased for Brown and later reported stolen."

[11]  Footnote 20 of the SJC's decision, inserted at this point, states: "Brown signed a waiver of his Miranda rights.  The officer receiving the waiver testified that Brown appeared to understand the rights he had explained to him."

2254(d)(1); <u>Rashad v. Walsh</u>, 300 F.3d 27, 34 (1st Cir. 2002).

The "contrary to" prong is satisfied when the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," <u>Williams v. Taylor,</u> 529 U.S. 362, 405 (2000), or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different] result." <u>Id.</u> at 406. The "unreasonable application" prong is satisfied if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413. Moreover, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411.

AEDPA also allows relief from a state court judgment if that judgment is based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "Under this standard, 'the state court's factual findings are entitled to a presumption of correctness that can be rebutted only by clear and convincing evidence to the contrary.'" <u>Rashad</u>, 300 F.3d at 35 (citations omitted). "Unless the petitioner can carry this heavy burden, a federal habeas court must credit the state court's findings of fact- and that remains true when those findings are made by a state appellate court as well as when they are made by a state trial court." <u>Id.</u> (citations omitted).

B.      <u>Sufficiency Of The Evidence</u>

Brown argues that the Commonwealth's case-in-chief was constitutionally insufficient to prove that Brown committed murder. (Pet. Br. at 32-42). At the close of the Commonwealth's

case, Brown moved for required findings of not guilty on all charges.  After a hearing, the trial

court denied the motions.  On appeal, the SJC acknowledged that while Brown's insanity

defense "effectively constituted an admission that Brown killed Oliveira and Meyer,"

Massachusetts law required the SJC to consider only the evidence admitted when the motions

were filed or, in other words, only the Commonwealth's case-in-chief.  Brown, 449 Mass. at 762.

After considering only the evidence presented in the Commonwealth's case-in-chief, the SJC

held that the evidence presented by the Commonwealth was sufficient to support Brown's

convictions of murder in the first degree.  Brown argues that a careful assessment of the evidence

presented by the Commonwealth demonstrates that there is no support for the jury's finding of

guilt.[12]  Accordingly, he argues that the SJC's decision was an "unreasonable application" of

Supreme Court precedent.  (Pet. Br. at 41).

The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution "protects

the accused against conviction except upon proof beyond a reasonable doubt of every fact

necessary to constitute the crime with which he is charged."  In re: Winship, 397 U.S. 358, 364

---

[12] In making this argument, Brown contends that this court is constrained to consider only the evidence presented in the Commonwealth's case-in-chief.  (Pet. Br. at 32-37).  Although Brown concedes that there is no "free-standing constitutional due process right to a directed verdict at the close of the Commonwealth's case-in-chief," he argues that because Massachusetts law requires the SJC to review a denial of a mid-trial motion for a required finding of not guilty based solely on the evidence presented by the Commonwealth in its case-in-chief, this Court must do the same.  (Pet. Br. at 34-37).  The Commonwealth argues that because there is no clearly established federal due process right to test the sufficiency of the evidence at the close of the prosecution's case-in-chief, the question of whether Brown's mid-trial motion for a required finding of not guilty was erroneously denied is a matter of state law, which may not form the basis for habeas relief.  (Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus ("Res. Br.") at 17-18.)  Because this claim may be denied based only on an analysis of the Commonwealth's case-in-chief, the Court need not address this argument.

(1970).  The standard applicable to a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979) (citations omitted) (emphasis in original).

The SJC's conclusion that the Commonwealth presented sufficient evidence during its case-in-chief to support a finding of guilt beyond a reasonable doubt is not an "unreasonable application of clearly established law."  In evaluating the sufficiency of the evidence, a court "must ascertain whether, 'after assaying all the evidence in the light most amiable to the government, and taking all reasonable inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime."  United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995) (quoting United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994)).  The court "must resolve all evidentiary conflicts and credibility questions in the prosecution's favor; and, moreover, as among competing inferences, two or more of which are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt."  United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995) (citations omitted).

In rejecting Brown's claim that the Commonwealth's evidence was insufficient to support a guilty verdict, the SJC stated:

> On the basis of that evidence, the jury could have found that Brown, with the help of Bobbitt, obtained a twenty-gauge shotgun and ammunition on Saturday, June 15, 1996; that he fired the gun several times in front of his residence in Roxbury at approximately 2 A.M. on Sunday, June 16, 1996; and that, after evading the police who responded to the fired shots, he left his residence with the shotgun and went to the South End.  The jury could have found further that Brown was the man who encountered Oliveira in front of 106 Appleton Street in the South End at approximately 3:30 A.M.; that he fired the shotgun twice at Oliveira, killing him;

that he then ran down Appleton Street and across Dartmouth Street, encountering Meyer near 131 Appleton Street; that Brown shot Meyer in the back of the head, killing him instantly; and that he then fled by continuing down Appleton Street toward West Canton Street.  The jury were also warranted in concluding that Brown obtained the gun intending to use it for the "business" of killing, and that he approached and shot each victim deliberately, without provocation, and at close range, intending to cause death.

In sum, based on the evidence in the Commonwealth's case-in-chief, it was both reasonable and possible for the jury to find beyond a reasonable doubt that Brown murdered Oliveira and Meyer, and that he did so with deliberate premeditation. Accordingly, the judge properly denied the motions for required findings of not guilty.

Brown, 449 Mass. at 762.

Brown concedes that the Commonwealth established the connection between Brown and the gun used in the shootings and that Brown fit the general descriptions of the shooter given by eyewitnesses.  (Pet. Br. at 38).  He argues, however, that the Commonwealth proved "nothing more" and that conjecture is required to conclude that Brown was present at the time and place of the shootings, and that he fired the fatal shots.  (Pet. Br. at 39, 41).

While the Commonwealth did not present any direct evidence that Brown was the shooter, direct evidence is not required to sustain a conviction.  "Reliance on indirect, as opposed to direct, evidence in a criminal case is both permissible and commonplace."  Spinney, 65 F.3d at 234 (citing United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994)).  "In fact, the government's proof may lay *entirely* in circumstantial evidence."  United States v. Valerio, 48 F.3d 58, 63 (1st Cir. 1995) (citing United States v. Akinola, 985 F.2d 1105, 1109 (1st Cir. 1993)) (emphasis in original).  "[W]hen a jury draws inferences from circumstantial evidence, a reviewing court should refrain from second-guessing the ensuing conclusions as long as (1) the inferences derive support from a plausible rendition of the record, and (2) the conclusions flow

rationally from those inferences." Spinney, 65 F.3d at 234.

Viewing the evidence in the light most favorable to the Commonwealth, the jury could have found that Brown was the assailant. There was trial testimony that after being questioned by the police for making noise by firing the gun into the air, Brown headed in the direction where the murders occurred, about an hour and a half before the murders. (Tr. 5:153-155).[13] As he walked towards the South End, Brown concealed his shotgun under his dark, Army-style jacket. (Tr. 5:150-153). Police recovered that same Army jacket from Brown's apartment after his arrest. (Tr. 4:135-141). The jacket was consistent with the descriptions given by eyewitnesses to the crime. (Tr. 5:241-242, 6:21, 51-52, Ex. 38). The jury could reasonably infer that the jacket was remarkable to eyewitnesses because it was a warm, summer evening, an unusual night to wear a heavy jacket. The jury could also reasonably infer that Brown wore the jacket to conceal the gun. In addition, police later recovered an empty box of shotgun shells from Brown's bedroom that matched the ammunition used in the murders. (Tr. 4:135-136).

Therefore, although the evidence was circumstantial, a reasonable jury could have found that the Commonwealth proved guilt beyond a reasonable doubt.[14] "[A] court 'ought not disturb,

---

[13] "Tr. ___" refers to cites to the transcript of the trial of petitioner Eric Brown. Citations to the trial transcript will be referenced by volume and page.

[14] A review of the sufficiency of all of the evidence presented at trial would only bolster the conclusion that any rational jury could have found Brown guilty of the murders. As the SJC observed, Brown's "defense, which sought to negate Brown's criminal responsibility on the basis of mental disease, effectively constituted an admission that Brown killed Oliveira and Meyer." Brown, 449 Mass. at 762, n. 31. While Brown presented expert testimony to support his insanity defense, the Commonwealth also presented expert testimony that Brown might have been malingering. (Tr. 17:93). It was within the jury's province to credit the Commonwealth expert's testimony over that of Brown's experts. See United States v. Thomas, 467 F.3d 49, 55 (1st Cir. 2006) ("It is ... within the unique province of the jury to sift through conflicting evidence, assess the credibility of witnesses, and find facts.").

on the ground of insufficient evidence, a jury verdict that is supported by a plausible rendition of the record.'" Olbres, 61 F.3d at 975 (quotations omitted).  Here, viewing the evidence in the light most favorable to the Commonwealth, the SJC's decision that the evidence was sufficient to convict Brown cannot be said to be objectively unreasonable and this claim should be denied.

C.  Post-Arrest Silence

Brown argues that the Commonwealth's introduction of evidence regarding his alleged post-arrest silence deprived him of a fair trial.  (Pet. Br. at 43-56).  Because Brown's counsel did not object at trial, the SJC reviewed this claim under a miscarriage of justice standard.  After review, the SJC denied this claim.

1.  Procedural Default

The Commonwealth argues that this claim is procedurally defaulted.  (Res. Br. at 21-24). This Court agrees.

"A finding by a state court that a defendant procedurally defaulted a claim bars federal habeas corpus relief on that claim unless that defendant as a petitioner shows either cause for the default and prejudice from the claimed violation of federal law, or that a fundamental miscarriage of justice will result if the claim is not considered." Gunter v. Maloney, 291 F.3d at 78 (citing Coleman v. Thompson, 501 U.S. 722, 750 (1991)).  The doctrine of procedural default arises out of  "the long-standing rule that federal courts do not review state court decisions which rest on 'independent and adequate state grounds.'" Simpson v. Matesanz, 175 F.3d 200, 205-06 (1st Cir. 1999).  "Such independent and adequate grounds exist where 'the state court declined to hear the federal claims because the prisoner failed to meet a state procedural requirement.'  In such a case, 'considerations of comity and federalism bar the federal court's review.'" Id. at 206.

In Massachusetts, the rule that "a claim not raised is waived" is regularly enforced and "firmly established." Gunter, 291 F.3d at 79. The SJC consistently enforces the rule that unpreserved claims are forfeited, see id., and enforced the rule in the instant case. Brown, 449 Mass. at 763. The SJC did review Brown's claim for a substantial miscarriage of justice under G.L. c. 278, § 33E, but "this sort of limited review does not work a waiver of the contemporaneous objection requirement." Horton v. Allen, 370 F.3d 75, 81 (1st Cir. 2004) (citations omitted); see also Gunter, 291 F.3d at 80 ("The mere fact that a state appellate court engages in a discretionary, and necessarily cursory, review under a 'miscarriage of justice' analysis does not in itself indicate that the court has determined to waive an independent state procedural ground for affirming the conviction.") (quotation omitted). Accordingly, Brown's claim regarding the introduction of his alleged post-Miranda silence is procedurally defaulted and habeas review is barred.

2.      Exceptions To Procedural Default Rule

Faced with a state court judgment resting upon an adequate and independent state ground, this Court may consider Brown's claim only if he "establishes 'cause and prejudice' with respect to the procedural default." Horton, 370 F.3d at 81; see also Burks v. Dubouis, 55 F.3d 712, 716 (1st Cir. 1995). To establish cause, Brown must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Horton, 370 F.3d at 81. In determining whether prejudice was established, "[t]he question is not whether the defendant would more likely than not have received a different verdict," but whether "he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Strickler v. Greene, 527 U.S. 263, 289-90 (1999) (citing Kyles v. Whitley, 514 U.S. 419, 434

14

(1995)).  Brown has not argued "cause and prejudice" to excuse the default.

Finally, "even absent a showing of cause and prejudice, a federal court exercising its habeas powers should nonetheless overlook a procedural default and hear a barred constitutional claim on the merits if its failure to do so would result in a fundamental miscarriage of justice." Burks, 55 F.3d at 717.  "To show that a fundamental miscarriage of justice would occur in the habeas context, 'petitioner must establish actual innocence.'" Gunter, 291 F.3d at 83 (quoting Simpson v. Matesanz, 175 F.3d at 210).

Here, Brown makes no claim of actual innocence.  Rather, Brown seeks to circumvent the procedural default by arguing that the Commonwealth waived its right to pursue this defense by not including it in its answer.  (Reply Memorandum of Law in Support of Petition for Writ of Habeas Corpus ("Pet. Rep. Br.") at 8-11).  This argument fails to save Brown's claim from default.  The Commonwealth filed a motion to amend its answer to include the procedural default as an affirmative defense, which this Court granted on October 9, 2009.[15]  The Commonwealth has therefore properly asserted a procedural default affirmative defense in this case.  See Day v. McDonough, 547 U.S. 198, 209 (2006) (recognizing that state's response to habeas petition may be amended by leave of court, which is to be liberally granted).  Accordingly, this Court recommends that the habeas petition be denied as it relates to Brown's claims regarding the alleged introduction of evidence of his post-arrest, post-Miranda silence as that claim is barred from review.

_____

[15] Respondent did not separately file the Amended Answer after the Court granted the motion to amend, presumably because Respondent had already attached a copy of the Amended Answer to the motion to amend.

3.      Merits Of The Claim

Even if Brown's claim that the introduction of his post-arrest silence was not

procedurally defaulted, it would fail on the merits.  Brown argues that with respect to this claim,

the SJC's decision was based on an "unreasonable determination of the facts," (Pet. Br. at 44-

46), constituted an "unreasonable application" of Supreme Court precedent, (Pet. Br. at 46-49),

and was "contrary to" established Supreme Court precedent.  (Pet. Br. at 49-56).  None of these

arguments is persuasive.

The night that Brown was arrested, Brown told the arresting officer, Richard McCarty,

that he had dropped two girls off in Winchester, Massachusetts and was returning home.  (Tr.

6:224).  Following his arrest, Brown was interrogated by Lieutenant Kevin Mooney.  Regarding

Lieutenant Mooney's interrogation, the prosecution elicited the following testimony:

> Q:      Could you tell the jurors, Lieutenant Mooney, what you said to Mr. Brown and
> what he said in response during the brief time that you spent with him?
>
> A:      After reminding him of his Miranda rights, I told him that I was aware of his
> statement about being in Cambridge and dropping off two girls in Winchester.
> And I told him that I was aware of that through Officer McCarty's report and in
> talking to Officer McCarty.
>
> Q:      When you said those words in substance to Mr. Brown, did he then respond in
> some way?
>
> A:      Yes.
>
> Q:      What did he say, if anything?
>
> A:      Well, I asked him if he had anything more to add to that.  And he responded, no,
> he did not.
>
> Q:      Did you have any further conversation with Mr. Brown?
>
> A:      I told him that - I asked him - I did, yes.

> Q:     What did you say to him and what did Mr. Brown say in response?
>
> A:     I asked him if he had anything further to add to his statement that he had given the officers during the night.  And he responded, no, he did not.

(Tr. 7:66-67).  Defense counsel did not object to this testimony.  On appeal, however, Brown argued that by eliciting this testimony, the prosecution impermissibly introduced evidence of Brown's post-arrest silence.  The SJC rejected Brown's claim.  Describing the evidence regarding Brown's post-arrest silence, the SJC stated:

> Following his arrest in Lincoln, Brown was interrogated by a police lieutenant. Brown told the lieutenant essentially what he had told the arresting officer: that he had dropped two girls off in Winchester and was returning home.  After discussing this with Brown, the lieutenant "asked him if he had anything further to add to his statement that he had given the officers during that night.  And he responded, 'no, he did not.'"

Brown, 449 Mass. at 762-63.  The SJC then concluded that Lieutenant Mooney's testimony that Brown had nothing further to say indicated that his statement was complete, not that Brown asserted his right to remain silent.  Id.

Brown now argues that the SJC misstated the evidence because there was no evidence that Brown repeated his pre-arrest statement that he had dropped two girls in Winchester to Lieutenant Mooney when he was interrogated after his arrest and after receiving Miranda warnings.  (Pet. Br. at 45).  Rather, Brown continues, Lieutenant Mooney was the one who repeated Brown's pre-Miranda statement to Officer McCarty, and then asked Brown whether he had anything to add to his pre-Miranda statement.  (Pet. Br. at 45).  Although Brown is correct that the record reflects that it was Lieutenant Mooney who repeated Brown's pre-arrest statement to him, the record also shows that Brown's statement to Lieutenant Mooney simply indicated that his statement was complete, not that Brown asserted his right to remain silent.  There was no

testimony that Brown refused to speak with the officers, that he requested an attorney or that he invoked his right to remain silent.  In fact, Brown had already signed a Miranda waiver form. (Tr. 6:248, Ex. 77).  Thus, the fact that Brown's pre-arrest statement was made to another officer at a different time is immaterial.  The SJC's interpretation of the record, namely, that Brown did not invoke this right to remain silent, was more than reasonable.

Moreover, even if Brown's statement to Lieutenant Mooney were to be considered an exercise of his Miranda rights, the testimony elicited from Lieutenant Mooney was not improper. Under Doyle v. Ohio, 426 U.S. 610 (1976), "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment."  However, police testimony that a defendant "refused to answer questions" or "invoked the Fifth Amendment" as part of a descriptive narrative does not always constitute a Doyle violation.  Haberek v. Maloney, 81 F.Supp.2d 202, 209-10 (D. Mass. 2000).  "Doyle does not forbid all mention at trial of Miranda warnings, and a defendants's response to them.  Indeed, the United States Court of Appeals for the First Circuit has stated that Doyle 'does not establish a rule which gives rise to constitutional error in every case in which the prosecutor refers to the defendant's post-arrest silence.'"  Id. at 210 (citing Grieco v. Hall, 641 F.2d 1029, 1033 (1st Cir. 1981)).

"In order for a witness' remarks to constitute an impermissible comment on silence, the remarks must (1) exhibit a manifest intent to comment on silence or (2) be of such a nature that a jury would naturally and necessarily construe the remarks as a comment on defendant's silence."

Id. (citations omitted).[16]  Neither factor is present in the instant case.  Here, the reference to

Brown's "silence" during Lieutenant's Mooney's testimony was not used to infer guilt.  It was

merely a part of a narrative description of Lieutenant Mooney's interactions with Brown.

Moreover, the testimony had nothing to do with the murders of June 16 but instead referred to

what Brown was doing ten days later.

Brown further argues that the prosecutor's questioning of Dr. David Rosmarin (Brown's

expert) and Dr. Malcolm Rogers (the Commonwealth's expert) about Brown's purported post-

arrest silence was improper because Brown's understanding of his Miranda rights was used by the

prosecution to infer sanity in violation of Wainwright v. Greenfield, 474 U.S. 284 (1986) (holding

that prosecutor's use of post-arrest, post-Miranda warnings silence as evidence of sanity violated

the Due Process Clause of the Fourteenth Amendment).  (Pet. Br. at 51-53).  Contrary to Brown's

arguments, however, Brown never invoked Miranda and the prosecutor did not question Dr.

Rosmarin and Dr. Rogers about Brown's purported post-Miranda silence.  Rather, the prosecutor

properly asked Dr. Rosmarin and Dr. Rogers to comment on Brown's understanding of his

Miranda waiver at booking.  (Tr. 13:176-177, 16:10-11).  Doyle and Wainwright protect the

exercise of the right to remain silent, not the waiver of such a right.  Cf. Anderson v. Charles, 447

U.S. 404, 408 (1980) ("[A] defendant who voluntarily speaks after receiving Miranda warnings

has not been induced to remain silent.").

Accordingly, the prosecution's questioning did not impinge upon Brown's right to remain

---

[16] The court in Haberek exhaustively catalogued the decisions "where direct testimony by a police officer (as part of the prosecution's case-in-chief) which refers to a defendant's silence or invocation of the Fifth Amendment is often not considered a violation of Doyle."  Haberek, 81 F.Supp.2d at 210, n.1.  Those decisions strongly weigh in favor of finding that the SJC's decision in this case that there was no Doyle violation was objectively reasonable.

silent.  The SJC's decision was neither an unreasonable application nor contrary to clearly

established federal law.  Therefore, this claim should be denied.

D.     Failure To Instruct The Jury On Intoxication

        Brown contends that the trial judge's failure to give a voluntary intoxication instruction

violated his federal constitutional right to due process.  He further argues that the SJC's

characterization of expert testimony regarding intoxication was clearly erroneous and was based

on an unreasonable determination of the facts.  (Pet. Br. at 57-59).  He also argues that the trial

court's failure to give an intoxication instruction relieved the Commonwealth of its burden of

proving that Brown had the specific intent to kill Oliveira and Meyer beyond a reasonable doubt.

(Pet. Br. at 60-61).  Brown's claim fails because the SJC's decision was based on an independent

and adequate state law ground, barring federal habeas review.  Even if the Court considers the

merits of the claim, Brown's claim still fails.  In order to successfully make this argument, Brown

must show that he was entitled to the intoxication instruction based on the facts and the failure to

give the intoxication instruction was a violation of federal law.  Brown fails to make either

showing and this claim should be denied.

        1.     The SJC's Decision Was Based On An
               Independent And Adequate State Law Ground.

        As an initial matter, review of this claim is barred.  Here, the SJC unambiguously rested

its rejection of Brown's claim on its determination that there was no underlying violation of state

law.  Brown, 449 Mass. at 768-769, n. 40.  ("Because we conclude that an intoxication instruction

was not warranted [under state law], we reject Brown's argument that the judge's failure to

provide an intoxication instruction relieved the Commonwealth of a portion of its burden of proof

in violation of his right to due process under the State and Federal Constitutions.").  Accordingly,

the SJC's decision was based on an independent and adequate state law ground and federal habeas review is therefore barred.[17] Sanna v. DiPaolo, 265 F.3d 1, 14, n. 5 (1st Cir.2001) (citing Coleman v. Thompson, 501 U.S. 722, 729-31 (1991); Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304 (1816)).

> 2.    The SJC's Decision Was Not Based On An
>        Unreasonable Determination Of The Facts.

Contrary to Brown's argument, the SJC's determination that an intoxication instruction was not warranted under state law was based on a reasonable determination of the facts. After carefully reviewing the record, this Court agrees with the SJC's factual determinations and finds them to be "not unreasonable." As the SJC correctly noted, "[n]either Bobbitt nor any other witness who was in Brown's company prior to the murders testified that Brown either consumed or appeared debilitated by the consumption of intoxicating substances." Brown, 449 Mass. at 768. While there was trial testimony that Bobbitt and two friends were smoking marijuana blunts on the night of the murder, no one testified that Brown shared the blunts. (Tr. 5:198).

Moreover, in contrast to Brown's characterization of the record, this Court does not read Dr. Rogers' testimony as referring to Brown's consumption of alcohol and/or drugs on the night of the murders but rather during the months leading up to the murders. (Tr. 15:170; 16:179, 182; 17:4,16). Only Brown's expert, Dr. Rosmarin, offered testimony about Brown's alleged consumption of alcohol and ingestion of drugs on the evening before the murders, but this was based on Brown's own statements to Dr. Rosmarin, and there was testimony that Brown related

---

[17] Brown also argues that the Commonwealth waived the "independent and adequate state law ground" defense with respect to this claim because it failed to raise it in its answer to Brown's habeas petition. As discussed above, however, the Commonwealth sought leave to file an amended answer including this defense, which the Court granted. Accordingly, Brown's waiver argument fails.

several different versions of the events to Dr. Rosmarin.  (<u>Compare</u> Tr. 9:131, 134, 135; 11:54, 57

<u>with</u> 11:59, 61).  In any event, the trial judge did not admit substantively the hearsay evidence of

Brown's statement to the doctors, but admitted the statements as evidence of the basis for the

doctors' opinions regarding Brown's criminal responsibility.  <u>See</u> <u>Commonwealth v. Jaime</u>, 433

Mass. 575, 577-78, n.1 (2001).  Therefore, Brown has not met his burden of rebutting, by clear

and convincing evidence, the presumption that the SJC's factual findings were correct.  <u>See</u>

<u>Rashad</u>, 300 F.3d at 35.  This claim should be denied.

      3.      Failure To Instruct The Jury On Voluntary
            <u>Intoxication Was Not A Violation Of Federal Law.</u>

Under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, the

prosecution must prove every element of the crime charged beyond a reasonable doubt.  <u>Winship</u>,

397 U.S. at 364.  Accordingly, a defendant's due process rights are violated if the trial court's

jury instructions relieve the prosecution of a portion of its burden of proof, or reduce the burden

of proof below the beyond a reasonable doubt standard.  <u>Sandstrom v. Montana</u>, 442 U.S. 510,

521 (1979).

However, the Due Process clause does not require that a jury consider evidence of

voluntary intoxication when a defendant's specific intent is at issue.  <u>Montana v. Egelhoff</u>, 518

U.S. 37, 48 (1996).  While federal law does not have such a requirement, Massachusetts law

provides that intoxication may be relevant to criminal responsibility.  <u>See</u> <u>Commonwealth v.</u>

<u>Henson</u>, 394 Mass. 584, 593 (1985).  Accordingly, only if the state criteria for an intoxication

instruction was met, could Brown have stated a claim for a federal constitutional violation.

<u>Sanna</u>, 265 F.3d at 14, n. 5.   In other words, the trial judge must have committed an error of state

law as a condition precedent to Brown's claim that the burden of proof shifted in a federally

unconstitutional matter.  <u>Id.</u> at 14, n. 5.  "[T]here could be no <u>Winship</u> violation in the absence of such an error."  <u>Id.</u>[18]

Here, the SJC found that an intoxication instruction was not warranted under state law and, therefore, the trial court did not commit an error of state law.  <u>Brown</u>, 449 Mass. at 769. Because the SJC's decision was not based on an unreasonable determination of the facts, <u>see</u> section III(D)(1), <u>supra</u>, Brown has failed to establish that the SJC's decision affirming the failure to instruct the jury on voluntary intoxication violated his federal constitutional rights. Accordingly, this claim should be denied.

E.      <u>Competency</u>

Brown argues that the trial judge's pretrial rulings on his competency to stand trial deprived him of a fair trial.  First, he asserts that the competency hearing was constitutionally inadequate because the judge only ordered an examination under G.L. c. 123, § 15(a) but refused to order a Bridgewater State Hospital evaluation under G.L. c. 123, § 15(b).[19]  (Pet. Br. at 67-68).

---

[18] Brown argues that because the SJC decided this issue under state law and did not cite federal law, Brown's claim of a federal constitutional violation with respect to the trial court's failure to give an intoxication instruction must be reviewed <u>de novo</u>.  (Pet. Br. at 57).  Brown is correct that, when a state court examines only state law, <u>de novo</u> review rather than the more deferential section 2254 standard of review would apply to this Court's analysis.  <u>Bly v. Nolan</u>, 583 F.Supp.2d 200, 203-204 (D. Mass. 2008).  However, federal law does not require an intoxication instruction even when there is evidence of voluntary intoxication.  <u>Egelhoff</u>, 518 U.S. at 48.  Accordingly, Brown can make out a federal due process violation only if he can show that the trial court erred in its application of state law by failing to instruct the jury on voluntary intoxication.

[19] G.L. c. 123, § 15(a) allows a judge to order a psychological examination when there is doubt about the defendant's competency to stand trial.  G.L. c. 123, § 15(b) provides that a "court <u>may</u> order that a person be hospitalized ... at [Bridgewater], for a period not to exceed 20 days for observation and further examination, if the court has reason to believe that such observation and further examination are necessary in order to determine whether mental illness or mental defect have so affected a person that he is not competent to stand trial ..." (emphasis added).

He also argues that the competency hearing was inadequate because the judge refused to order the production of Brown's Bridgewater medical records and the tape recording of the District Court hearing held pursuant to <u>Rogers v. Commissioner of the Dep't of Mental Health</u>, 390 Mass. 489 (1983).[20]  (Pet. Br. at 68).  Finally, Brown argues that the evidence of competency was insufficient to satisfy the Commonwealth's burden.  (Pet. Br. at 69).  The SJC rejected each of Brown's contentions.  This Court concludes that the SJC's decision was not based on an unreasonable determination of the facts, and was neither contrary to, nor an unreasonable application of, clearly established federal law.

1.    Procedural Competency Claim

Here, the trial court did hold a competency hearing so Brown can only challenge the adequacy of that hearing.  Brown argues that his procedural due process rights were violated by the trial court's failure to order that he be hospitalized at Bridgewater for a further evaluation pursuant to G.L. c. 123, § 15(b) after the court's clinical psychologist found Brown incompetent to stand trial in March 2001.  The SJC's determination was reasonable.  As the SJC noted, "the language of G.L. c. 123, § 15(b) ('the court *may* order that the person be hospitalized' [emphasis added]) is permissive rather than mandatory."  <u>Brown</u>, 449 Mass. at 760 (citing <u>Commonwealth v. Lameire</u>, 50 Mass. App. Ct. 271, 276 (2000)).  Here, the SJC found that at the time Brown requested the § 15(b) examination, he had already been committed to Bridgewater for several years and evaluations of him had already been filed with the court periodically during that time.  <u>Id.</u>  The SJC also found that the judge's refusal to order the production of Brown's Bridgewater

---

[20] On March 14, 2001, a hearing was held in Brockton District Court pursuant to <u>Rogers</u>, 390 Mass. at 494-499, at which a District Court judge determined that Brown was not competent to make medical decisions and ordered that Brown resume taking his medications.  <u>Brown</u>, 449 Mass. at 750 n. 7.

medical records and the tape recording of the <u>Rogers</u> hearing did not render the hearing constitutionally inadequate as they would have been cumulative of the other evidence presented at the competency hearing. <u>Id.</u>

Brown has not cited to any Supreme Court precedent that would cast doubt on the constitutional adequacy of the procedures followed by the trial judge in this case. "Due process requires a court to hold a competency hearing *sua sponte* whenever evidence raises a sufficient doubt as to the competence of the accused." <u>Johnson v. Norton</u>, 249 F.3d 20, 26-27 (1st Cir. 2001) (citing <u>Drope v. Missouri</u>, 420 U.S. 162, 180 (1975); <u>Pate v. Robinson</u>, 383 U.S. 375, 385 (1966)). In this case, the trial judge ordered an evaluation by the court clinical psychologist. After the court clinical psychologist opined that Brown was incompetent to stand trial, the court continued the trial, ordered a further evaluation by the Commonwealth's psychologist, and conducted a four-day competency hearing at which four witnesses testified. (S.A. 4, 211-219). It was not unreasonable for the SJC to conclude that the hearing requirement established in <u>Drope</u> and <u>Pate</u> was satisfied by these procedures and, accordingly, this claim should be denied.

2.    <u>Substantive Competency Claim</u>

The SJC recognized that under <u>Dusky v. United States</u>, 362 U.S. 402, 402 (1960), the standard for determining competency to stand trial is whether a defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding of the proceedings against him." <u>Brown</u>, 449 Mass. at 759-60 (quoting <u>Commonwealth v. Crowley</u>, 393 Mass. 393, 398 (1984) and <u>Dusky</u>, 363 U.S. at 402). This Court concludes that the SJC's determination that the Commonwealth proved that Brown was competent to stand trial under the <u>Dusky</u> standard was not based on an unreasonable determination of the facts.

25

Here, after a four-day hearing at which contradictory expert testimony was presented, the trial judge credited the Commonwealth's expert.  (S.A. 214).  This expert testimony, in combination with "Brown's medical history, the witness's comprehensive psychiatric evaluation of Brown, and the witness's conclusion that Brown was competent to stand trial ... [and] Brown's conduct and demeanor during the proceeding and his interaction with his attorneys,"[21] Brown, 449 Mass. at 761, was sufficient to support the trial judge's conclusion that Brown was competent to stand trial.  Even in the face of contradictory evidence, therefore, it was reasonable for the SJC to find that there was no substantive due process violation and it is therefore recommended that Brown's substantive competency claim also be denied.

F.      Voluntariness Of Brown's Statements

Finally, Brown argues that the trial court's failure to hold a *sua sponte* hearing on the voluntariness of Brown's statements to various civilian and police witnesses between June 15 and June 26, 1996 violated his right to due process.  The Commonwealth introduced these statements in its case-in-chief.  The defense did not object to the admission of these statements on voluntariness grounds either before trial or at the time they were admitted in evidence.  On the tenth day of trial, the Commonwealth filed a motion requesting that the judge rule that certain statements already admitted in evidence were voluntary.  (Tr. 10:5 - 10:11).  Brown's counsel asked the judge to wait before ruling on the voluntariness of the statements until after he had heard expert testimony regarding whether Brown was suffering from a mental illness.  (Tr. 10:7).  The judge declined to delay his ruling, and ruled, over objection, that the Commonwealth had

---

[21] The judge also observed that Brown "was attentive and appeared at all times to interact appropriately with defense counsel."  (S.A. 214).  As the SJC correctly noted, a defendant's demeanor in court is relevant but not a dispositive factor.  Brown, 449 Mass. at 761.

proved beyond a reasonable doubt that each of the statements at issue was made freely, willingly, and voluntarily.  (Tr. 10:11-10:12).  At the end of trial, the judge provided the jury with a "humane practice" instruction regarding the voluntariness of Brown's statements.[22] (Tr. 18:90-18:91).

On appeal, Brown challenged the trial judge's decision not to hold a *sua sponte voir dire* regarding the voluntariness of Brown's statements.  Based on its interpretation of state law, the SJC decided against Brown.  It noted that Brown had not objected and, in any event, to the extent that the voluntariness of Brown's statements became a live issue after their admission, the judge properly submitted the voluntariness issue to the jury by providing the humane practice instruction.  Brown, 449 Mass. at 767.

In challenging the admission of the statements here, Brown recognizes that "federal law, in contrast to Massachusetts law, imposes no obligation on courts to conduct a voluntariness hearing *sua sponte*."  Yeboah-Sefah v. Ficco, 556 F.3d 53, 80 n. 21 (1st Cir. 2009) (citing Wainwright v. Sykes, 433 U.S. 72, 86 (1977); Commonwealth v. Harris, 371 Mass. 462 (1976)) (Pet. Br. at 77).  He argues, however, that the SJC's application of state law was "wholly arbitrary and irrational" so as to deprive Brown of his right to a fair trial.  (Pet. Br. at 74).  This Court disagrees.

Even if the SJC committed an error of state law,[23] "it is not the province of a federal

---

[22] A "humane practice" instruction provides that the jury should not consider the defendant's confession or admission unless the jury is satisfied that the confession or admission was the result of a voluntary act.  See Commonwealth v. Harris, 371 Mass. 462, 469-70 (1976).

[23] Indeed, Brown's argument begs the question of whether the SJC could err in its interpretation of Massachusetts state law.  See Zagrodny v. Brady, C.A. No. 05-12551-GAO, 2008 WL 4723634, *7 n. 6 (D. Mass. Oct. 24, 2008) (observing that it may be "impossible for the SJC to misinterpret its own precedents.  [The precedents] mean what the [SJC] most recently

27

habeas court to reexamine state-court determinations on state law questions." Estelle v. McGuire,

502 U.S. 62, 67-68 (1991).  "Although there may be an exception if an error of state law could be

sufficiently egregious to amount to a denial of equal protection or of due process of law," Brown

v. Maloney, 267 F.3d 36, 44 (1st Cir. 2001), this Court cannot say that is the case here.  In

rejecting Brown's claims, the SJC noted that where a defendant does not raise the issue of

voluntariness, "[a] judge has a sua sponte obligation to conduct a voir dire only if the

voluntariness of the statements is a live issue such that there is evidence of a 'substantial claim of

involuntariness.'" Brown, 449 Mass. at 766 (citing Commonwealth v. Stroyny, 435 Mass. 635,

646 (2002)).  It also noted that, "when a defendant raises an insanity defense, the voluntariness of

all his statements does not automatically become a live issue."  Id. (citing Commonwealth v.

Benoit, 410 Mass. 506, 515 (1991)).

Here, the SJC found that when Brown's statements were introduced into evidence, "there

was no substantial claim that at the time they were made Brown was suffering from the effects of

mental illness and that the statements were attributable in large measure to that mental illness."

Id.  Indeed, it found that the Commonwealth's evidence was that Brown understood what was

said to him and others understood what he said.  In addition, the SJC noted that "defense

counsel's strategy with respect to the statements was to question whether they, in fact, had been

made, rather than challenging their voluntariness."  Id. at 767.  Finally, the SJC concluded that

"[t]o the extent that the voluntariness of Brown's statements became a live issue after their

admission (during the defense case), the judge properly submitted the voluntariness issue to the

jury by providing the humane practice instruction."  Id.   Under these circumstances, it cannot be

---

says they mean.").

said that the SJC's decision was arbitrary and capricious and therefore denied Brown of his fundamental right to due process.  Accordingly, this claim should be denied.

IV.      RECOMMENDATION

For the foregoing reasons, I recommend that the Court DENY the Petitioner Eric Brown's Petition for Writ of Habeas Corpus in its entirety.

V.       REVIEW BY DISTRICT JUDGE

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b).  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Phinney v. Wentworth Douglas Hospital, 199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983 F.2d 343 (1st Cir.1993).

/s/ Jennifer C. Boal
JENNIFER C. BOAL
United States Magistrate Judge

29